453 A.2d 945

COMMONWEALTH of Pennsylvania, Appellee,

v.

Alexander JENKINS, III, Appellant.

Supreme Court of Pennsylvania.

Submitted Oct. 22, 1982.

Decided Dec. 23, 1982.

A. Benjamin Johnson, Jr., James S. Bruno, Philadelphia (court-appointed), for appellant.

428

Robert B. Lawler, Chief, Appeals Div., Marianne E. Cox, Asst. Dist. Attys., for appellee.

Before O'BRIEN, C.J., and ROBERTS, NIX, LARSEN, FLAHERTY, McDERMOTT and HUTCHINSON, JJ.

OPINION

LARSEN, Justice.

On October 7, 1977, Alexander Jenkins, appellant, and his brother, Terence, stabbed one Jose Mercado to death in his apartment. An eyewitness who knew appellant testified that she saw him running out of the victim's apartment seconds before Jose Mercado was found bleeding to death in the hallway. Testimony also established that, after the killing, appellant had bragged to others that he had killed "a Spanish guy". Pursuant to a search warrant, certain items of clothing were found in appellant's apartment which were stained with blood of the same type as that of decedent but different than appellant's blood type.

Appellant admitted, on the witness stand, that he had told his uncle that he had cut Jose Mercado. Appellant had also given to investigating officers an inculpatory statement admitting he had repeatedly stabbed the victim, which statement was read into evidence.

Based upon the above, appellant was convicted by a jury of murder of the third degree, and sentenced to ten to twenty years imprisonment. This appeal followed.

Appellant's first contention is that the trial court erred in denying him the right to call two character witnesses to testify in his behalf. During its case in chief, the prosecution had called two witnesses, Diane Frierson, appellant's girlfriend at the time and the mother of his child, and Mrs. Mildred Frierson, Diane's mother.[1] Defense counsel in-

1. Both witnesses were called to establish appellant's occupancy of the apartment where the bloody clothing was found, which was also occupied by the witnesses. Additionally, Diane Frierson was called to establish ownership of a hat found at the scene of the crime which she had previously identified as belonging to appellant.

formed the court that Diane Frierson intended to invoke her Fifth Amendment privilege to refuse to testify on the ground that her testimony might tend to incriminate her, and requested the court to appoint counsel to represent her. The court then appointed separate counsel to represent both Diane and her mother.

Out of the jury's presence, each witness was called to the stand and sworn, and each witness pleaded the Fifth Amendment to each and every question asked to her, including "do you know the defendant, Alexander Jenkins?" (Notes of Testimony, April 7, 1978, at 5.105 and 5.110).[2] The trial court permitted the invocation of the privilege in each instance, and the witnesses were excused.

■ After the Commonwealth had rested, appellant attempted to call these same witnesses to testify as to his reputation. The trial court ruled that they could not be called as character witnesses because, since each had pleaded the Fifth Amendment when asked if they knew appellant, they were incompetent to testify as to his character or reputation and "that to allow [the witnesses] to turn their testimony off for the Commonwealth and on for defendant would deny the Commonwealth a fair trial and border on suborning perjury". (Opinion of the Honorable Joseph T. Murphy at 3.) We agree that the invocation of the Fifth Amendment privileges to the questions propounded by the Commonwealth, including whether the witnesses knew appellant, rendered them incompetent to testify as character witnesses on behalf of appellant.

Appellant argues that the witnesses should have been permitted to testify in his behalf because "the position taken by the government ignores the common practice of witnesses changing his or her mind and often electing to forgo the privilege. Moreover, here the liability to which the witnesses would subject themselves [in testifying as character witnesses on behalf of appellant] is substantially less since the

2. The privilege was invoked even to such routine questions as where the witnesses lived, whether Mildred Frierson was the mother of Diane, and Mildred's age. (N.T. 5.102–5.111).

cross-examination of a reputation witness is extremely limited when compared to the interrogation permitted on cross-examination of a fact witness". Brief for Appellant at 7.

This Court is well aware that a witness can "change his or her mind" but, thankfully, knows of no rule of law or reason that would permit such convenient "changes of mind" to handicap the prosecution as it would be handicapped if appellant's position were to be adopted. Given the witnesses' consistent and habitual invocation of the privilege to even such innocuous matters as whether they *knew* the appellant, the effectiveness of the Commonwealth's cross-examination would be thoroughly emasculated. Were we to follow appellant's position, the Commonwealth in this case would not even have been able to demonstrate the obvious potential for bias inherent in the relationship of the witnesses to the appellant (mother and grandmother of appellant's child who were sharing an apartment with appellant).

Under these circumstances, the court did not err in refusing to permit Diane and Mildred Frierson to testify as character witnesses on behalf of appellant.

■ Appellant's only other assertion of trial error is that his inculpatory statement read into evidence over objection was inadmissible as it violates this Court's so-called "interested-adult" rule, sometimes referred to as the *McCutcheon* rule. *Commonwealth v. McCutchen,* 463 Pa. 90, 343 A.2d 669 (1975) (defendant's confession should have been suppressed because "he was not given the benefit of parental or interested-adult guidance".) We do not agree.

The record makes it abundantly clear that the behavior of the investigating officers in this case was an exemplary and successful attempt to comply with both the letter and the spirit of the interested-adult rule. (Notes of Testimony of Suppression Hearing of January 19–24, 1978: testimony of Detective Michael Bittenbender at 1.30–1.65, and ruling of the Honorable George J. Ivins at 3.180–3.207; Notes of Testimony of Trial, April 7–8, 1978 at 5.153–6.20; Common-

wealth's Exhibit C–1 "Chronology of Interrogation and/or Custody"). That record discloses the following events:

Appellant and his brother were arrested at 2:45 p.m. on October 26, 1977. Present at the time of arrest was Mrs. Mildred Frierson (maternal grandmother of appellant's child). Mrs. Frierson asked the officers if she could go to the homicide unit with appellant and his brother (who was also arrested). Detective Bittenbender arranged for a police car to drive Mildred Frierson to the station while appellant was transported there in a van. At no time prior to the rendering of the statement in issue, however, did either appellant or Mrs. Frierson request that the latter be given permission to speak with appellant.

While appellant was being driven to the police station, Detectives Bittenbender and Diegel, realizing that appellant was under 18 years of age (appellant was 17 years, 7½ months old at the time of his arrest), attempted to locate a close relative to serve as an interested-adult. The detectives located appellant's grandmother, Mrs. Fannie Jenkins, who was unable, however, to accompany them to the police station. Mrs. Jenkins attempted to locate and contact appellant's father, but was not able to do so. (Mr. Jenkins, the father, did not reside with appellant and, according to the grandmother, had nothing to do with the upbringing of his children.)

Mrs. Jenkins then suggested that the detectives contact Mr. Arthur Marshall, appellant's uncle, who had helped raise appellant and his brother, Terence. (Appellant had, in fact, resided with Mr. Marshall until about one or two years prior to this crime, as did at least two of appellant's other siblings at the time of the crime.) Mr. Marshall agreed to assist appellant and his brother and was immediately driven to the police station. It was explained to Mr. Marshall that his nephews had been arrested for the stabbing death of Jose Mercado and that he (Mr. Marshall) was to advise them as to whether they should invoke their constitutional (*Miranda*) rights.

When Mr. Marshall arrived at the police station, he first assisted appellant's brother and was present with Terence for approximately 40–45 minutes. Appellant, who had been alone in an interrogation room since being brought to the station at 3:15 p.m., banged on the door of the interrogation room and said that he wished to make a statement. Mr. Marshall was then taken to appellant's room. At approximately 4:50 p.m., Detective Bittenbender, reading from a statement form, carefully advised both appellant and Mr. Marshall of appellant's constitutional rights and asked them to sign the statement form to demonstrate only that the rights had been read to them. They did sign the statement and the officer left them alone for three to five minutes to discuss whether appellant should give a statement.

When Detective Bittenbender returned, at approximately 4:55 p.m., appellant again expressed his desire to make a statement. He then personally filled in answers to seven specific questions [3] and initialed them, including the question "Do you want to talk to a lawyer at this time, or to have a lawyer with you while we ask you questions?" In response, appellant wrote "No, I have uncle." At this point, shortly

**3.** These questions and the printed responses are:
1. Q. Do you understand that you have a right to keep quiet, and do not have to say anything at all?
   A. Yes.
2. Q. Do you understand that anything you say can and will be used against you?
   A. Yes
3. Q. Do you want to remain silent?
   A. I tell you
4. Q. Do you understand that you have a right to talk with a lawyer before we ask you any questions?
   A. Yes
5. Q. Do you understand that if you cannot afford to hire a lawyer, and you want one, we will not ask you any questions until a lawyer is appointed for you free of charge.
   A. Yes
6. Q. Do you want to talk with a lawyer at this time, or to have a lawyer with you while we ask you questions?
   A. No, I have uncle
7. Q. Are you willing to answer questions of your own free will, without force or fear, and without any threats or promises having been made to you?
   A. Yes

after 5:00 p.m., appellant began to make a statement. Prior to beginning his statement, Mr. Marshall said to appellant "Just a minute. Alexander, are you sure you want to tell the detective what happened?" Appellant answered affirmatively, and Mr. Marshall said "all right". This statement was interrupted at 5:22 p.m. when appellant's father came into the room and requested the interview be ended.

Appellant was then left alone in his room except for a fifteen minute visit by Mrs. Frierson and a short interview with a juvenile detention home officer. At 7:32 p.m., appellant was arraigned.

It is apparent that the investigating officers were well aware of *McCutcheon* and did everything they could to comply with the "interested-adult" rule. Appellant now asks this Court to expand *McCutcheon* and to create, in effect, a "*most* interested-adult" rule. Appellant suggests that we invalidate the use of his statement because either Mrs. Frierson or appellant's father were *more* interested in appellant's welfare, than was Mr. Marshall (appellant's uncle), asserts that Mr. Marshall was "more prosecution oriented", and that the police interfered and inhibited his "contact with friendly, interested, related and informed adults". Brief for Appellant at 9–10.

None of these specious assertions are supported by the record. Mr. Marshall was certainly an interested and informed adult concerned with appellant's welfare, and the police first attempted to obtain the assistance of both appellant's father and grandmother prior to securing Mr. Marshall's assistance. Faced with the arraignment time constraints of *Commonwealth v. Davenport*, 471 Pa. 278, 370 A.2d 301 (1977) (the "six-hour" rule), the police wisely chose an eminently reasonable course of action in bringing Mr. Marshall to the station to consult with appellant. We will not require our law enforcement officers to conduct a survey of a defendant's relatives, interview them, and make an evaluation as to which is "most interested" in the minor's welfare. From the foregoing, it is clear that appellant was given full and fair opportunity to consult with an interested

and informed adult prior to waiving his *Miranda* rights and that, therefore, the admission of his statement into evidence was not erroneous.[4]

Judgment of sentence affirmed.

O'BRIEN, C.J., and ROBERTS and NIX, JJ., concurred in the result.

**4.** This author continues to espouse the view that the *McCutcheon*-"interested-adult" rule, which "irrebuttably presumes that no one under the magic age of 18 years can make a statement to the police without the assistance of the indispensible 'interested adult' ", is an improper and unnecessary impediment to legitimate public interests in effective law enforcement. *See Commonwealth v. Henderson,* 496 Pa. 349, 359, 437 A.2d 387, 392 (1981) (Larsen, J., dissenting, joined by Flaherty and Kauffman, JJ.). As stated in my dissent in *Henderson,* the totality-of-the-circumstances approach, which considers the age of the defendant as *a factor* of voluntariness and not a *per se* trigger requiring specialized procedures, is the proper approach to take in these situations. Under this approach, appellant's waiver of his constitutional rights was clearly knowing, intelligent and voluntary.